**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JAMES R. TIDD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) **C.A. 04-378 Erie** |
| | ) |
| **JO ANNE B. BARNHART,** | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION

This case is before us on appeal from a final decision by the defendant, Commissioner of

Social Security ("the Commissioner"), denying James R. Tidd's claim for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the

Social Security Act (the "Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The parties have submitted

cross-motions for summary judgment. For the reasons stated below, the Plaintiff's motion for

summary judgment is granted and this matter is remanded to the Commissioner for an award of

benefits. The Defendant's motion for summary judgment is denied.

### I. General Background

Mr. Tidd applied for disability insurance benefits on December 17, 2002, and for

supplemental security income on November 19, 2002, alleging disability based on mental illness,

anxiety, and social problems since May 30, 2002. His application was initially denied. Under a

test program in which there is no reconsideration of the Agency's initial decision, 20 C.F.R. §§

404.906, 416.1406, Mr. Tidd requested a hearing before an Administrative Law Judge. Mr.

Tidd, represented by counsel, appeared and testified at an administrative hearing before

Administrative Law Judge ("ALJ") Elliot Bunce on May 11, 2004. (R. at 30-54.) A vocational

expert, Fred Monaco, testified at the hearing. On June 22, 2004, the ALJ issued his decision

denying disability benefits and supplemental security income and finding that Mr. Tidd was not

disabled. (R. at 17-23.)

The Appeals Council denied Mr. Tidd's request for review on December 14, 2004, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 6-8.) Mr. Tidd then filed this action seeking judicial review of the ALJ's decision.

Mr. Tidd was born on July 5, 1963, has a high school education, is divorced and has two children. He has past work experience as a truck driver.

Mr. Tidd was admitted at St. Vincent Health Center in March 1991 for about nine days after presenting himself in the emergency room with suicidal thoughts. More recently Mr. Tidd's treating sources were Lance A. Besner, M.D. in February 2000; Millcreek Community Hospital, who referred Mr. Tidd to outpatient psychological services at Community Integration, Inc. in September 2002; and Sean Su, M.D. and Lynn Taylor, M.D. who treated Mr. Tidd at Community Integration, Inc. from September 2002 through February 2004.

Mr. Tidd was also evaluated by the State Agency Psychologist Byron E. Hillin, Ph.D., on February 20, 2003. (R. at 197-204.) Sanford Golin, Ph.D., assessed Mr. Tidd and completed a mental residual functional capacity form and a Psychiatric Review Technique Form ("PRTF") both dated March 24, 2004. (R. at 205-207; R. at 208-221.)

Mr. Tidd also has medical evidence from the Action Review Group, Inc. and the Disability Advocacy Program, which produced a report dated May 16, 2003, and authored by Kathleen Taddonio, M.S.W., L.S.W. (R. at 115-122.) Ms. Taddonio and the review team (which included Ronald Refice, Ph.D.) which assessed Mr. Tidd's medical records found that Mr. Tidd had a severe disability and did not retain the residual functional capacity to perform any work. (R. at 121.)

## II. Standard of Review

The standard of review in social security cases is whether substantial evidence exists in the record to support the Commissioner's decision. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir.2000). "Substantial evidence has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.1999) (quoting

2

Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir.1995)). Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently. Fargnoli, 247 F.3d at 38; 42 U.S.C. § 405(g).

"Under the Social Security Act, a disability is established where the claimant demonstrates that there is some 'medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period.'" Fargnoli, 247 F.3d at 38-39 (quoting Plummer, 186 F.3d at 427 (other citation omitted)); see also 20 C.F.R. § 404.1505(a). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42 U.S.C. § 423(d)(2)(A)).

The Commissioner has provided the ALJ with a five-step sequential evaluation process to be used when making this disability determination. See 20 C.F.R. § 404.1520. The United States Court of Appeals sets forth the five-step procedure as follows:

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § [404.] 1520(a). . . . In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). . . . In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994). If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. *See* 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. *See,* [sic] Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984).

Fargnoli, 247 F.3d at 39 (quoting Plummer, 186 F.3d at 428).

"The Commissioner has supplemented this sequential process for evaluating a claimant's

eligibility for benefits with additional regulations dealing specifically with mental impairments."

Plummer, 186 F.3d at 428 (citing 20 C.F.R. § 404.1520a) .

> These procedures require the hearing officer (and ALJ) to record the pertinent signs,
> symptoms, findings, functional limitations and effects of treatment contained in the case
> record, in order to determine if a mental impairment exists. 20 C.F.R. § 404.1520a(b)(1).
> If an impairment is found, the examiner must analyze whether certain medical findings
> relevant to a claimant's ability to work are present or absent. § 404.1520a(b)(2). The
> examiner must then rate the degree of functional loss resulting from the impairment in
> certain areas deemed essential for work. If the mental impairment is considered "severe",
> the examiner must then determine if it meets a listed mental disorder. § 404.1520a(c)(2).
> If the impairment is severe, but does not reach the level of a listed disorder, then the
> examiner must conduct a residual functional capacity assessment. § 404.1520a(c)(3). At
> all adjudicative levels, a Psychiatric Review Treatment Form ("PRT form") must be
> completed. § 404.1520a(d). This form outlines the steps of the mental health evaluation
> in determining the degree of functional loss suffered by the claimant.

Id. at 428-429 (footnote omitted). When rating the degree of functional loss from the

impairment, section 404.1520a(b)(3) provides that the examiner evaluate four areas of function

considered essential to work: "daily living; social functioning; concentration, persistence, or

pace; and deterioration or decompensation in work or work-like settings." Id. at 428 n.3. "The

degree of functional loss is rated on a scale that ranges from no limitation to so severe the

claimant cannot perform these work-related functions." Id.

The claimant carries the initial burden of demonstrating by medical evidence that he is

unable to return to his previous employment due to a medically determinable impairment.

Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Once the claimant meets this

burden, steps one through four described supra, the burden of proof shifts to the Commissioner

to show that the claimant can engage in alternative substantial gainful activity. Id.

## III. ALJ's Decision

In summary, the ALJ found that based on Mr. Tidd's non-exertional mental limitations

and his age, education, and work experience, that Mr. Tidd is not under a "disability." (R. at 23.)

In particular, the ALJ found that Mr. Tidd retains the residual functional capacity to perform

work-related activities provided that the work consists of no more than simple, routine,

repetitious tasks, with one or two step instructions, performed in a low-stress environment,

4

defined as work requiring few decisions, or more than occasional contact with the public,

coworkers, or supervisors. (R. at 22.)

The ALJ undertook the five-step sequential evaluation in determining that Mr. Tidd was

not disabled. The ALJ made the following findings:

(1) that Mr. Tidd had not engaged in substantial gainful activity since May 30, 2002;

(2) that Mr. Tidd suffers from depressive disorder, psychotic disorder, and substance abuse (in early remission), mental impairments which are severe;

(3) his mental impairments, although severe, do not meet or equal the criteria of the Listing of Impairments set forth in 20 C.F.R. Pt. 404, SubPart P, Appendix 1, Regulations No. 4;

(4) he retains the residual functional capacity for work with the following limitations: he cannot perform more than simple, routine, repetitious tasks, with one or two step instructions, performed in a low stress environment, defined as work requiring few decisions; or more than occasional contact with the public, coworkers, or supervisors; and

(5) based on his age, educational background, work experience, and residual functional capacity Mr. Tidd would be able to make a successful adjustment to work which exists in significant numbers in the national economy, such as an unarmed security guard, janitor or cleaner, and a machine feeder.

The ALJ also found that Mr. Tidd's "allegations regarding his limitations are not totally

credible for the reasons set forth in the body of the opinion." (R. at 22.) In addition, the ALJ

assigned "little weight" to medical evidence from the Action Review Group, Inc. and the

Disability Advocacy Program explaining, in part, that the sources "did not examine or treat the

claimant," and the opinion was contradicted by the state agency opinions. (R. at 20.) The ALJ

instead found that the opinions of the state agency were consistent with the medical evidence, in

particular with Mr. Tidd's treatment record from Community Integration, Inc. (R. at 20.)

## IV. Relevant Medical Evidence

### A. Treatment at St. Vincent Health Center

Mr. Tidd was seen in St. Vincent Health Center in March 1991 in the emergency room

for assessment of suicidal ideas and tendencies. (R. at 130–160.) He was assessed as having

depression and feelings of hopelessness and helplessness, and was admitted to the hospital from

March 11, through March 18, 1991. (R. at 130–160.) Upon admission, Mr. Tidd was evaluated

by Dr. F. Simora, who gave a diagnosis of Adjustment Disorder with Mixed Disturbance of

5

Emotion and Conduct, Drug and Alcohol Abuse and Dependence (primarily alcohol and marijuana), and Marital Problems. (R. at 139.) During the course of his admission, Mr. Tidd was diagnosed by a Psychologist with Major Depression, Recurrent, Psychoactive Substance Abuse (not otherwise specified), Alcohol Abuse, and Anti-Social Personality Disorder. (R. at 157.) On his discharge summary, Mr. Tidd was diagnosed by Dr. Simora with Adjustment Disorder with Depressed Mood, and Drug and Alcohol Dependence. (R. at 132.)

## B. Treating Physician Lance A. Besner, M.D.

Mr. Tidd was evaluated on February 3, 2000, by treating psychiatrist, Lance A. Besner, M.D. for evaluation and treatment of his mood and anxiety symptoms. (R. at 161-165.) In his description of the history of Mr. Tidd's illness Dr. Besner noted that he has had "numerous episodes of depression since childhood characterized by depressed, anxious, and irritable mood, decreased interest in activities, impaired concentration, increased sleep, decreased appetite, weight loss[], decreased libido, helplessness, hopelessness, [and] worthlessness;" he has suffered "panic attacks since October or November 1999 occurring two to three times per week;" his medication is 50 mg of Zoloft; and that he has "periods of elevated mood lasting up to one day characterized by racing thoughts, talkativeness, overactivity, and distractibility [with] a history of spending sprees out of control, speeding, and risky sexual activity." (R. at 162.) Dr. Besner reports Mr. Tidd's substance use history as using speed, alcohol, and marijuana, that Mr. Tidd had been treated at a Residential Recovery program for 28 days in 1992, and that his prior marriage ended due to Mr. Tidd's substance abuse. (R. at 162.) Dr. Besner notes that Mr. Tidd had no contact with his mother for the last two years, no contact with his daughter, and only speaks to his son two to three times per year. (R. at 162.) Dr. Besner also reported that Mr. Tidd has five close friends; he engages in hunting, cards, sledding, and reading; and he has a lot of social anxiety. (R. at 163.)

On examination Dr. Besner reported that Mr. Tidd's mood and affect were moderately depressed and mildly anxious; his affect was appropriate to thought content with the range of affect being restricted; his thought process was goal directed with no flight of ideas, loosening of

6

associations or delusions; and his insight and judgment are fair with obvious impairment in judgment as shown by his delay in seeking help. (R. at 163.) Dr. Besner's diagnosis was Major Depression, recurrent, moderate; Panic Disorder with Agoraphobia; Rule out Social Anxiety Disorder; History of alcohol, stimulant and marijuana abuse; and a diagnosis of Rule out Avoidant Personality Disorder. (R. at 163.) With regard to Mr. Tidd's hypomanic episodes, Dr. Besner remarks that the "symptoms are suggestive of hypomania at times," but he did not diagnose Mr. Tidd as hypomanic because the episodes were not "unequivocal." (R. at 163.)

Dr. Besner described his treatment plan as medication therapy for depression and panic disorder; abstention from drugs and alcohol; return to Alcoholics Anonymous meetings; and continue with individual psychotherapy with Larry Herl. (R. at 163.)

## C. Treatment at Millcreek Community Hospital and Community Integration, Inc.

On September 3, 2002, Mr. Tidd presented himself at the emergency room at Millcreek Community Hospital seeking help for depression and anxiety in order to obtain outpatient services. (R. at 166-171.) Thereafter, Mr. Tidd was treated at Community Integration, Inc. from September 2002 through February 2004. (R. at 173-196, 222-244.)

On September 10, 2002, a psychosocial assessment form was administered by Jay Verno, L.S.W. (R. at 182-196.) Mr. Verno noted that Mr. Tidd was presenting with problems with confusion, staying focused, anxiety, anger, difficulty handling stressful situations, and that he does not like to be around others. (R. at 183.) Mr. Verno reported that Mr. Tidd actively participated in the session, he was alert and cooperative, had adequate hygiene and eye-contact, his affect was anxious, he could not sit still, his mood was depressed, he had difficulty expressing thoughts into words, his thought process was organized and relevant, his thought content was hopelessness, helplessness, worthlessness, and paranoid, he had short term memory impairment, with good insight and fair judgment. (R. at 192, 195.) Mr. Tidd reported that he had had no contact with his mother for the past 10 years, no contact with his father for that past 1-1/2 years; and that he has no contact with his siblings except for his 3 full sisters. (R. at 187.) Mr. Tidd reported that his work problems arose because he gets bored easily, is unable to focus,

7

has trouble interacting with people, and has trouble with authority. (R. at 188.) Mr. Verno's diagnostic impression was Major Depressive D/O recurrent and Polysubstance Abuse. (R. at 193.)

On September 17, 2002, Mr. Tidd underwent a psychiatric evaluation performed by Dr. Sean Su. (R. at 177, 178-181.) Mr. Tidd appeared at his appointment after using methamphetamines in the morning, claiming that if he did not use the methamphetamines he would not have been able to come to the evaluation. (R. at 178.) Mr. Tidd was minimally cooperative with the evaluation, being "generally unwilling to provide much detailed history" or to elaborate on his history, and he became angry and defensive regarding any further discussion of his substance use. (R. at 178-180.) Mr. Tidd reported that he is estranged from his family and that he has not had recent contact with any family members. (R. at 178.) Dr. Su reported Mr. Tidd's speech as coherent and goal directed, but often pressured; his mood as 'not good;' and his affect as extremely irritable and sometimes verbally agitated. (R. at 180.) He further explained that Mr. Tidd stated that talking with other people is very scary for him including the evaluation. (R. at 180.) Dr. Su notes that Mr. Tidd reports auditory hallucinations of hearing voices, but that he is unable to make out what the voices say. (R. at 180.) Dr. Su reported Mr. Tidd as having average intelligence, fair insight, and poor judgment by history. (R. at 180.) Dr. Su's diagnoses were Psychotic Disorder, not otherwise specified; Polysubstance Dependence; Rule out attention Deficit Hyperactivity Disorder; and Rule out Psychotic Disorder due to substance abuse. (R. at 180.) Dr. Su started Mr. Tidd on the medication Zyprexa to treat his mood instability and psychosis. (R. at 181.)   Thereafter Mr. Tidd reported to Community Integration for regular medication checks and individual therapy sessions starting September 25, 2002, and lasting until February 10, 2004. (R. at 231-232, 240-241.)

A Psychological Evaluation Report was completed by Psychologist Michael Schwabenbauer, Ph.D., and Psychology Intern Tammy Kordes, M.A. (R. at 233-235.) The report shows that Mr. Tidd was administered a number of formal psychological tests and was interviewed over the course of two sessions in October 2002. (R. at 233-235.) The Evaluation

8

shows that Mr. Tidd was alert, oriented, pleasant, and appeared to appreciate the nature and scope of the assessment. (R. at 233.) His affect was flat and he was increasingly anxious as the evaluation proceeded. (R. at 233.)

At the time of the evaluation Mr. Tidd was on Effexor and Zyprexa. (R. at 234.) His intelligence was average, but he also showed a significant drop in cognitive efficiency on more formal measures of attention and concentration. (R. at 234.) His verbal fluency was within expected limits. (R. at 234.) On his personality test, Mr. Tidd "demonstrated an extreme over-response style making the validity of this measure questionable." (R. at 234.) He endorsed significant psychological disturbance, and his response pattern indicated a person reporting emotional turmoil, anxiety and depression. (R. at 234.) The authors noted that his "extreme elevation" on this aspect of the test "is likely an exaggeration of symptoms in a plea for help." (R. at 234.) The authors concluded that Mr. Tidd has a "mild-moderate decline on basic attentional measures and more complex measures of divided attention;" "thought processing was logical and coherent;" and he was able to work "for sustained periods and did not demonstrate any disorder of impulse control." (R. at 234.) The authors noted Mr. Tidd's mild anxiety during the assessment process concluding that it "indicates that he has difficulty effectively utilizing coping strategies resulting in maladaptive behavior patterns." (R. at 234.) His personality assessment "is consistent with acknowledging a significant degree of internal distress marked with limited success utilizing coping strategies." (R. at 235.)

The medical evidence from Community Integration also includes eleven completed "Medication Management Progress Note" forms resulting from Mr. Tidd's attendance at Community Integration from October 7, 2002, to February 10, 2004. (R. at 173, 175, 222-227, 237-239.) These forms indicate that all but two of the visits were in conjunction with scheduled medication checks, while the April 28, 2003 form notes that Mr. Tidd appeared as a walk-in, and the February 6, 2003 form indicates Mr. Tidd appeared on an emergency basis. (See R. at 225, 226.) There appear to be no reports on Mr. Tidd's approximately eight other separate individual therapy sessions. The Progress Notes indicate as follows:

<u>10/7/02</u>: Unkempt appearance, good hygiene; cooperative behavior, he was not sleeping and had no appetite; his mood/affect was depressed, fearful, and irritable; his cognition was within normal limits, but it was questioned whether he was paranoid; he denied hallucinations. Mr. Tidd reported that he had taken methamphetamines on the weekend, and complained of anxiety and depression; he felt Zyprexa helped with his mood swings, but not his depression; response to treatment was seen as inadequate. Effexor was added for his depression and Temazepam for sleep, and his global assessment functioning was placed at 50. (R. at 175.)

<u>11/8/02</u>: Appearance is within normal limits; cooperative behavior, he was not sleeping but did have an appetite; his mood/affect was anxious, irritable, and angry; his cognition was paranoid; and he had auditory hallucinations. Mr. Tidd complained of an inability to concentrate, and that he was avoiding interactions with others because of his low tolerance for stress. He was relatively more stable, but still having mood instability and psychosis. Response to treatment was seen as fair. Zyprexa was increased to treat psychosis and instability, and his global assessment functioning was placed at 50. (R. at 173.)

<u>1/17/03</u>: Appearance is within normal limits, good hygiene; pleasant and cooperative behavior; he was sleeping and had an appetite; his mood/affect was depressed and anxious; he had paranoid cognition; auditory hallucinations as background muttering he could ignore. Mr. Tidd reported that he had increased depression but overall improvement; response to treatment was seen as partially effective. His Effexor was increased, and his global assessment functioning was placed at 50. (R. at 227.)

<u>2/6/03</u>: [*Emergency Basis.*]  Appearance is within normal limits, good hygiene; cooperative behavior; he was sleeping and had an appetite; his mood/affect was depressed and anxious; he had paranoid cognition. Mr. Tidd reported that he had flushed all his medications down the toilet to keep himself from "taking them all at once;" response to treatment was seen as fair/poor. He was given a two-week supply of medications for safety purposes. His global assessment functioning was placed at 50. (R. at 226.)

<u>4/28/03</u>: [*Walk-in.*]  Appearance is within normal limits, good hygiene; pleasant and cooperative behavior; he was sleeping and had an appetite; his mood/affect was depressed and anxious. Mr. Tidd reported that his "depression was kicking my ass - not going away," and he reported uncontrollable crying, decreased motivation, obsessive thinking, erratic sleep and early waking. He feels the Effexor was not effective due to deep bouts of depression; response to treatment was seen as partially adequate. His Effexor was increased, and his global assessment functioning was reduced to 45. (R. at 225.)

<u>6/19/03</u>: Appearance is within normal limits, good hygiene; pleasant and cooperative behavior; he was sleeping and had an appetite; his mood/affect was anxious; he had paranoid cognition. Mr. Tidd reported that he had a rough month, was now in a new home, and for the most part eliminated 40% of stress, and he was doing moderately better, with some days of dysphoria; response to treatment was seen as adequate. He was referred to a stress anxiety group; and his global assessment functioning was placed at 50. (R. at 224.)

8/7/03: Appearance is within normal limits; pleasant and cooperative behavior, he was sleeping and had an appetite; his mood/affect was anxious; within normal limits cognition; and auditory hallucinations. Mr. Tidd reported to the intake nurse that the "meds helped some - but it's not doing a lot for my depression," he rated his depression a 3-4 on a scale of 1 to 5; he reported sleeping 12 hours at night with a 3 to 4 hour nap during the day; and he reported decreased motivation. The doctor reported that Mr. Tidd claimed to be doing generally well, functioning better on medication, and complaining of anxiety and of excessive sedation due to medications. Response to treatment was seen as fair. His Temazepam was stopped to address the sedation; Buspar was started for anxiety; his global assessment functioning was placed at 50. (R. at 223.)

9/30/03: Unkempt appearance, bad hygiene; cooperative behavior; he was sleeping and had an appetite; his mood/affect was within normal limits; within normal limits cognition; auditory hallucinations as crowded muttering. Mr. Tidd reported that he had been blacking out, but did not go to his primary care physician, and rated his depression as a 3 on a 1 to 5 scale. He complained of increased anxiety and isolation; his presentation was schizoid like and he appeared internally preoccupied. He denied acute depression, and denied recent alcohol use despite strongly smelling of stale alcohol. Response to treatment was not indicated. His Zyprexa was increased for probable increased psychosis, and his global assessment functioning was reduced to 45. (R. at 222.)

10/28/03: Unkempt appearance; cooperative behavior; he was sleeping and had an appetite; his mood/affect was flat; within normal limits cognition; and auditory hallucinations. Mr. Tidd reported to the intake nurse that the increase in Zyprexa was not doing a whole lot either way; his auditory hallucinations were at a lower volume, but on bad days was constant; he reported that he was over 8 months sober; and he reported that he either slept 12 hours a night, or he slept 3 to 4 hours a night. Mr. Tidd reported to the Doctor that he had lingering anxiety when he was stressed, and he was sleeping well. The Doctor noted that he was less internally preoccupied than last visit and had a blunt affect. Response to treatment was seen as adequate. No medication change was done, and his global assessment functioning was placed at 50. (R. at 239.)

12/11/03: Unkempt appearance; pleasant and cooperative behavior; he was sleeping and had an appetite; his mood/affect was anxious; within normal limits cognition; no hallucinations. Mr. Tidd reported that he likes to read, hunt and fish, and maybe has increased sleep; he was stable. He claimed that he was doing relatively better, but still had good days and bad days; response to treatment was seen as fair. No medication change was done, and his global assessment functioning was placed at 50. (R. at 238.)

2/10/04: Appearance is within normal limits; cooperative behavior; he was sleeping and had an appetite; his mood/affect was flat; no auditory hallucinations. Mr. Tidd reported that he had good days and bad days, and complained of increased sleep during winter; overall he was stable, with no acute psychotic state. Response to treatment was seen as stable. No medication change was done, and his global assessment functioning was placed at 50. (R. at 237.)

### D. Non-Treating State Agency Psychologist Byron E. Hillin, Ph.D.

Mr. Tidd was evaluated by the State Agency Psychologist Byron E. Hillin, Ph.D., on February 20, 2003. (R. at 197-204.) Dr. Hillin reported that Mr. Tidd was prompt for the interview, was driven to the interview by a friend, and was generally cooperative and truthful. (R. at 197.) Mr. Tidd complained of significant mood difficulties, irritability, depression, and anxiety. (R. at 197.) He admitted his substance abuse and at the time of the evaluation had been sober for approximately 10 weeks, attending Alcoholics Anonymous 5 to 6 times a week. (R. at 197.)

Dr. Hillin reported that Mr. Tidd handled his own finances and does all of his activities of daily living including cooking and cleaning. (R. at 198.) Mr. Tidd described himself as a loner with difficulties interacting with people, and often getting into verbal confrontations. He noted that he has enjoyed reading in the past but has been unable to read because of concentration difficulties. (R. at 199.) He has no contact with his ex-wife or his son or daughter. (R. at 199.) Mr. Tidd explained that he had a total of 11 brothers and sisters from both his mother and father, and that he is estranged from his family, having contact with only one sister. (R. at 199.) He indicated that he was sexually abused as a child but did not want to discuss the matter. (R. at 199.)

Upon examination Dr. Hillin found Mr. Tidd to be alert, oriented to place, person and circumstance; he had normal grooming and hygiene, good eye-contact, and no excessive fidgeting. (R. at 199-200.) Dr. Hillin reports Mr. Tidd's speech and thought as relevant, coherent, and goal directed, with no pressuredness in speech. (R. at 200, 201.) Mr. Tidd reported that his moods are quickly changeable from irritability to depression and excessive worriedness. (R. at 200.) Mr. Tidd also complained of sleep difficulty, ranging from only getting two hours of sleep per night, to sleeping up to 12 hours. (R. at 200.) Mr. Tidd also described his auditory hallucinations as constant mumbling in the background, and he explained that his thoughts raced and he had an inability to concentrate. (R. at 201.)

12

Dr. Hillin noted Mr. Tidd's affect as being mildly anxious, while also noting that he
appeared to be in mild to moderate distress. (R. at 200.) Dr. Hillin described Mr. Tidd as having
average intelligence, good attention, fair concentration, but only mildly problematic, noting that
Mr. Tidd is able to follow directions and retain directions easily. (R. at 201.) Dr. Hillin's
diagnostic impression was: Alcohol Dependence, in partial remission; Amphetamine
dependence, in partial remission; and Depressive Disorder not otherwise specified, moderate;
and he gave Mr. Tidd a global assessment functioning of 65-70. (R. at 202.) In his summary
and treatment recommendations, Dr. Hillin stated in part as follows:

> He is currently treated at Community Integration by psychiatrist Dr. Su. He is on
> multiple psychotropic medications including Zyprexa, Effexor and temazepam.
> He feels that he has improved with his medications, but continues to complain of
> mood fluctuation and concentration difficulties. Given his extensive history of
> methamphetamine use and alcohol dependence, one would expect continued
> difficulties in mood stabilization and in general cognitive abilities. His current
> complaints of mood instability and cognitive problems are felt to be substantially
> influenced by his drug and alcohol addiction problems. He is in need of
> continued psychiatric care and continued drug and alcohol treatment. . . .
>
> In regard to functioning, he continues all of his activities of daily living. He
> evidences mild concentrational difficulties. He would be expected to get along
> fairly with others. He would be expected to handle stress fairly. His general
> intelligence was in the average range. He would be expected to do moderately
> complex task[s] in a reasonable fashion.

(R. at 202.) Dr. Hillin also noted on an attached form that Mr. Tidd would have "good" ability
to follow work rules and use judgment, but only "fair" ability in relating to co-workers, dealing
with the public, interacting with a supervisor, dealing with work stresses, functioning
independently, and maintaining attention and concentration. (R. at 203.) Dr. Hillin found
Mr. Tidd had "unlimited" or "very good" ability to understand, remember, and carry out simple
job instructions; "good" ability to understand, remember and carry out detailed, but not complex
job instructions; and "fair" ability to understand, remember and carry out complex job
instructions. (R. at 203.) Finally, Dr. Hillin found that Mr. Tidd had "good" ability to maintain
personal appearance, "fair" ability to behave in an emotionally stable manner, "fair" ability to
relate predictably in social situations, and "fair" ability to demonstrate reliability. (R. at 203.)

13

**E. Non-Treating State Agency Psychologist Sanford Golin, Ph.D.**

Sanford Golin, Ph.D., reviewed the medical records and completed a mental residual functional capacity form ("MRFC") and a Psychiatric Review Technique Form ("PRTF"), both dated March 24, 2004.  (R. at 205-207; R. at 208-221.)

Dr. Golin used Dr. Hillin's diagnosis of Depressive Disorder, not otherwise specified, moderate, in finding that Mr. Tidd had a medically determinable impairment that did not satisfy the diagnostic criteria.  (R. at 211.)  Dr. Golin rated Mr. Tidd as having "Mild" restrictions of daily living; "Moderate" difficulties in maintaining social functioning; "Moderate" difficulties in maintaining concentration, persistence, or pace, and having insufficient evidence to assess whether he had repeated episodes of decompensation.  (R. at 218.)  Besides reviewing Dr. Hillin's evidence, Dr. Golin indicated that he relied on the March 1991 St. Vincent records; the September 17, 2002 report of Dr. Su from Community Integration; an October 7, 2002 cognition report; Dr. Besner's February 3, 2000 report; and a July 14, 2000 report regarding the St. Vincent hospitalization.  In the "Consultant's Notes" section of the PRTF, Dr. Golin states that Mr. Tidd's "credibility is partial re allegation of mental illness; not impairing (see MRFC)."  (R. at 220.)  Dr. Golin gave "great weight" to Dr. Hillin's opinion.  (R. at 207.)

On the MRFC, Dr. Golin reported that Mr. Tidd was not significantly limited in all areas, except that he was moderately limited in the following areas:

• ability to maintain attention and concentration over extended periods,

• ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances,

• ability to work in coordination with or proximity to others without being distracted by them,

• ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods,

• ability to interact appropriately with the general public,

• ability to accept instructions and respond appropriately to criticism from supervisors,

14

• ability to get along with coworkers or peers,

• ability to respond appropriately to changes in the work setting, and

• ability to set realistic goals or make plans independently of others.

(R. at 205-206.)

## V. **Legal Analysis**

Mr. Tidd argues that the ALJ erred in failing to adequately account for all of Mr. Tidd's impairments in determining Mr. Tidd's residual functional capacity.

Mr. Tidd also argues that the ALJ's decision finding that he did not meet or equal the Part B requirements of § 12.04 of the listed impairments is not supported by substantial evidence. We need not address this argument since we decide this case on the first argument.

### A. **ALJ's Assessment of Mr. Tidd's Residual Functional Capacity**

Mr. Tidd argues that the ALJ erred in failing to adequately account for all of Mr. Tidd's impairments in determining Mr. Tidd's residual functional capacity. He argues that the ALJ failed to take into account his testimony regarding his sleep patterns, panic attacks, manic depressive episodes, and reclusive nature, that show that Mr. Tidd was unable to meet attendance requirements for work. Specifically, he argues that the ALJ cites no support for his determination that Mr. Tidd is able to maintain regular attendance at work when "the record fully supports [his] testimony that he is unable to maintain the required level of attendance at any job." (Plaintiff's Brief in Support, at 18.) He thus argues that the hypothetical posed to the vocational expert by the ALJ is not supported by substantial evidence because it fails to reflect all of Mr. Tidd's impairments.

We must determine whether substantial evidence supports the ALJ's determination of Mr. Tidd's residual functional capacity. To resolve this issue we must determine whether the ALJ's credibility finding is sufficient, which will necessarily entail an inquiry into whether the record evidence supports Mr. Tidd's testimony. The Commissioner does not directly address the issue of whether the record fully supports Mr. Tidd's testimony that he is unable to maintain the required level of attendance at any job. Instead, the Commissioner's brief directly focuses on

15

supporting the ALJ's residual functional capacity determination, and only obliquely argues in support of the ALJ's finding that Mr. Tidd is not totally credible. However, in order to make a credibility determination the ALJ must assess the evidence that supports or contradicts the claimant's testimony. Therefore, we will first address the evidence relating to the relevant testimony of Mr. Tidd, and then we will address the Commissioner's argument that substantial evidence supports the ALJ's residual functional capacity determination.

### 1. Residual Functional Capacity Determination

The ALJ must consider all relevant evidence when determining an individual's residual functional capacity in step four. Fargnoli, 247 F.3d at 40 (citing 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546); Burnett v. Commissioner, 220 F.3d 112, 121 (3d Cir.2000). That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. Fargnoli, 247 F.3d at 40 (citing 20 C.F.R. § 404.1545(a)).

The ALJ found that Mr. Tidd retained the residual functional capacity "to perform work at any exertional level that does not require: more than simple, routine, repetitious tasks, with one or two step instructions, performed in a low-stress environment, defined as work requiring few decisions; or more than occasional contact with the public, coworkers, or supervisors." (R. at 19.) The ALJ also found that given his residual functional capacity Mr. Tidd could not return to his past work as a truck driver and that he has no transferable skills. (R. at 21.)

### a. ALJ's Hypothetical

The ALJ asked the vocational expert

> to consider an individual of [Mr. Tidd's] age, education, and work history, who's able to perform work at any exertional level, that does not require more than simple, routine, repetitious tasks, with one or two step instructions. Performed in a low stress environment, defined as work requiring few decisions and that requires no more than occasional contact with the public, co-workers, and supervisors.

(R. at 49.) The ALJ further asked the vocational expert if there "[w]ould be any unskilled entry level occupations that a person with this profile could perform?" (R. at 49.) The vocational

16

expert replied that there would be jobs in the national economy that would accommodate the

ALJ's hypothetical, and he proceeded to list those jobs. (R. at 49-50.)

### b. Claimant's Counsel's Hypothetical

Mr. Tidd's position is that the ALJ ignored or failed to consider his testimony that

demonstrates that he was incapable of meeting attendance requirements for any work.

Following the ALJ's examination, counsel for Mr. Tidd questioned the vocational expert

regarding attendance requirements as follows:

> **Q.** Dr. Monaco, all of these jobs that you have testified about that meet the
> hypothetical posed by the Judge.  Do those jobs require consistent attendance at
> work?
> **A.** Attendance policies vary, but for the most part with the 700 some employers
> I've dealt with over the years, anything that would exceed one day per month
> would not be tolerated in these entry level type positions.
> **Q.** And if the Claimant were unable to go to work more than one day per month
> on an unscheduled basis, would that result in him being able to perform these
> jobs?
> **A.** Missing more than one day per month?
> **Q.** Correct.
> **A.** Yes, that would eliminate the jobs in my opinion, because there would be no
> reason, these are entry level positions, and somewhat easy to fill.  There are no
> skills involved, so that would eliminate the positions.

(R. at 51.)  Next, Mr. Tidd's attorney posed a hypothetical to the vocational expert to include

limitations as set forth in Mr. Tidd's testimony, and the vocational expert opined that an inability

to maintain regular attendance would mean that Mr. Tidd would not be able to perform any

work:

> **Q.** . . . Let me factor [Mr. Tidd's testimony] into my hypothetical as well, Dr.
> Monaco, both that he does not leave the farm more than one day a week, and that
> he has one day [per] week, approximately, where he does not come out of his
> room.  If the Judge credits that testimony, is this gentleman employable?
> **A.** Both of these factors in combination, and definitely separate, the attendance
> issues, and sleep issues as one, and the reclusiveness as another, either of those
> issues would eliminate all employment, as I'm aware of its existence in the local
> or national economy.

(R. at 53.)

17

### c. ALJ's Credibility Determination

As noted previously, the ALJ made the following finding at the end of his decision:

5. The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the opinion.

(R. at 22.)   In the body of the opinion the ALJ addressed the attendance requirements issue at the conclusion of his review of the vocational expert's testimony, as follows:

The expert said that regular attendance must be maintained to sustain any job. I find that the claimant is capable of this within the scope of the residual functional capacity adopted here.

(R. at 21.) Thus, the implication is that the ALJ rejected Mr. Tidd's testimony that he would not be able to satisfy attendance requirements of a job. Nowhere in his opinion does the ALJ directly address Mr. Tidd's testimony to explain why he found it not credible. The ALJ also made no findings with regard to Mr. Tidd's claims regarding his sleep difficulties, his panic attacks that require a full day of sleep recovery, his reclusiveness, his manic and depressive behavior, and his leaving the house only once per week, and the effect these have on his ability to attend work.

### 2. Credibility Determination and Claimant's Subjective Complaints

#### a. Applicable Law

An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. 404.1529(a). Social Security regulations specifically incorporate a two-part evaluation of subjective symptoms. *See* 20 C.F.R. § 404.1529 (setting forth factors describing how allegations of subjective symptoms are to be evaluated). First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms. 404.1529(b); SSR 96-7p. If such an impairment exists, then the ALJ must determine the extent to which the claimant's allegations are credible by evaluating "the intensity and persistence of the pain or symptom, and the extent to which it affects the [claimant's] ability to

18

work." Hartranft v. Apfel, 181 F. 3d 358, 362 (3d Cir. 1999); 404.1529(b); SSR 96-7p. In
making this determination, the ALJ should consider the objective medical evidence as well as
other factors such as the claimant's own statements, the claimant's daily activities, the treatment
and medication the claimant has received, any statements by treating and examining physicians
or psychologists, and any other relevant evidence in the case record. 20 C.F.R. 416.929(c);
SSR 96-7p.

It is the responsibility of the ALJ to make credibility determinations. Smith v. Califano,
637 F.2d 968, 972 (3d Cir. 1981); Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974), cert.
denied, 420 U.S. 931 (1975). The ALJ's credibility determination is entitled to deference by this
Court. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3rd Cir. 1983); Reefer v. Barnhart, 326
F.3d 376, 380 (3d Cir. 2003). The ALJ, as the finder of fact, can reject, partially or fully,
subjective complaints if he finds them not credible based on other evidence in the record. See
Baerga v. Richardson, 500 F.2d 309, 312 (3rd Cir. 1974).

"If the ALJ determines that the claimant's subjective testimony is not fully credible, the
ALJ is obligated to explain why. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir.2002) (quoting
Burnett, 220 F.3d at 120). The ALJ may reject subjective complaints "if he affirmatively
addresses the claim in his decision, specifies the reasons for rejecting it, and has support for his
conclusions in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990). When the ALJ
is faced with conflicting evidence, "he must adequately explain in the record his reasons for
rejecting or discrediting competent evidence." Sykes v. Apfel, 228 F.3d 259, 266 n.9 (3d Cir.
2000)(quotations and citations omitted). A district court need not defer to the ALJ's credibility
determinations that are not supported by substantial evidence. Smith, 637 F.2d at 972; Baerga
v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974).

### b. References to Claimant's Testimony in the ALJ's Decision

We first review the portions of the Decision where the ALJ refers to Mr. Tidd's
testimony.

19

The ALJ found that Mr. Tidd did not have a Substance Addiction Disorder as set forth in

section 12.09. (R. at 19.) The ALJ supported that finding by explaining that "the evidence does

not contradict the claimant's testimony that he has been free of substance abuse." (R. at 19.)

In addressing whether Mr. Tidd had a marked limitation in one of the four categories in

Part B of the listings, the ALJ stated with regard to <u>Activities of Daily Living</u>,

• the claimant "testified that he lives in a boarding house and is able to conform to the rules that apply there," and

• the claimant's "report of activities shows some limitations, but none that would rule out the simple, low-stress tasks specified in the residual functional capacity adopted here . . . .".

With regard to <u>Social Functioning</u> and the <u>Ability to Maintain Concentration, Persistence, and</u>

<u>Pace</u> the ALJ stated,

• Mr. Tidd's "social life is limited, but the record does not show serious incidents with friends, family members, or authority figures,' and

• Mr. Tidd's mental impairments "reasonably may be expected to limit him to the simplest tasks and to require no more than occasional contact with others, but these features are incorporated in the RFC adopted here."

(R. at 19.)

More specifically, the ALJ gave a summary of Mr. Tidd's testimony, in which he also

discussed some of the medical records, as follows:

The claimant testified that he lives in a boarding house, does his own chores, and cares for his personal hygiene. He reads books of ma[n]y types and watches television. He said that he is irritable and has trouble sleeping and the he dislikes being around people. He said the he thinks about suicide constantly and hears voices. The claimant has been diagnosed with depression and with what was earlier called a psychotic disorder (Exhibit 4F) and later a schizoid-like presentation (Exhibit 8F). The record notes his complaints of auditory hallucination but not to the extent that simple, low-stress tasks would be ruled out. The claimant testified to ongoing suicidal ideation, but I note that a recent treatment record from Community Integration (Exhibit 8F/1), in September 2003, states that the claimant denied such ideation. The most-recent record, in February 2004 (Exhibit 9F), notes no acute psychotic state and a stable condition. The claimant's thought processes continued to be in order.

(R. at 20.) Finally, as already noted, the ALJ stated:

The expert said that regular attendance must be maintained to sustain any job. I find that the claimant is capable of this within the scope of the residual functional capacity adopted here.

(R. at 21.)

Other than the above passages there are no other references to the claimant's testimony

or to the ALJ's assessment of the claimant's credibility anywhere else in the opinion.

### c. Mr. Tidd's Testimony

The claimant comes to this court questioning whether the ALJ fully or adequately

considered his relevant testimony, which is as follows:

The ALJ questioned Mr. Tidd, starting with questions regarding his mood, and anxiety:

[**ALJ**]  . . . . how are your moods generally, if you stick to your medications?
**A.** I still have erratic mood swings that I can't control.
**Q.** Do you have many on the high side, or is it mainly on the low side?
**A.** Mainly on the low side.
**Q.** Are there any periods of anxiety?
**A.** Yes.  I'm going through one right now.
**Q.** Does that have something to do with the pressure of coming into the hearing,
and the whole events here?
**A.** Yes.

(R. at 40-41.)  Next, the ALJ questioned Mr. Tidd regarding his interaction with others, leaving

his house, and panic attacks:

**Q.** All right.  How are you around groups of people generally?
**A.** Not well.
**Q.** Now, I think you indicated to me before that although you're free to come and
go at the boarding house, you tend to stay in most of the time?
**A.** Yes.
**Q.** Would that be accurate?
**A.** Yes.
**Q.** What do you do about things like grocery shopping?
**A.** My landlady does the grocery shopping.  So I don't have to.
**Q.** Do you ever get panic attacks?
**A.** Yes, sir.
**Q.** How often do they happen?
**A.** When I'm stressed out or put into a social situation where I'm not
comfortable.

(R. at 41.)  The ALJ then directly asked Mr. Tidd about the type of job that the ALJ eventually

determined Mr. Tidd could perform, specifically asking about attendance issues:

**Q.** There are jobs out there, Mr. Tidd, that are a lot simpler and, candidly, less
stressful than driving a truck, which can be a demanding job.  The question I have
to answer not only is whether you can be a truck driver, and I don't think you can
at this point, but I must also determine whether you can do other work, and that
would include work that is simple, repetitive work that doesn't really expose you
to the public much at all, or even to co-workers.  But it's a given for jobs like this

21

that good attendance is mandatory.  You have to go to work every day, you have to stay on the job all day.  You get some absences, but not many.
**A.** Yeah.
**Q.** What do you feel are the main factors today, that would keep you from doing even a simple job like that full-time?
**A.** The fact that I have erratic sleep patterns.  Even though it's been over a year I've been on medications, I still - - my sleep patterns are erratic.  I either sleep in excess, or I don't sleep at all.
**Q.** Does that translate into fatigue?
**A.** Yes.

(R. at 40-42.)

When Mr. Tidd's counsel had the opportunity to question him, she probed further into the areas covered by the ALJ, starting with Mr. Tidd's panic attacks:

[**Counsel**] You told the Judge you get panic attacks whenever you're uncomfortable, or in a crowd.  When you have a panic attack, what happens to you?
**A.** I get short of breath, can't breathe.  It feels like somebody sitting on my chest.  I tend to black out and not remember what happens.
**Q.** Can you tell the Judge approximately how often you would have these panic attacks?
**A.** They vary with the amount of stress I'm under.  And when I get in large crowds of people, I get panic attacks.
**Q.** Would you have them - - take a good week and a bad week.  In a good week, how many would you have?
**A.** One or two.
**Q.** In a bad week, how many would you have?
**A.** Four or five.
**Q.** And when you have them, how long does it take you to recover from them?
**A.** It usually takes me a full day.
**Q.** And for that day, what do you do?
**A.** Sleep.

(R. at 43-44.)

Next, she questioned him generally about his mood, how often he leaves his house, and his activities:

**Q.** Do you still have problems with the depression getting worse, even though you're on medications?
**A.** Yes.
**Q.** And do you still have days when you don't leave your room at the boarding house?
**A.** Yes.
**Q.** How often does that happen?
**A.** Maybe once a week.
    . . .

22

**Q.** How many times a week would you say that you leave the farm, or do you stay around the farm pretty much all the time?

**A.** I pretty much stay on the farm all the time. I - - like I said, my landlord does my shopping, so I don't have to leave the farm. I try to buy my cigarettes in the carton so I don't have to leave the farm.

**Q.** Did you have activities while you were working that you liked to do, that you're unable to do anymore?

**A.** Yes.

**Q.** What kind of things?

**A.** I used to like to go out with my friends, and maybe go to a movie or dancing. I don't do those things anymore.

(R. at 44-45.)

Mr. Tidd's counsel also asked him about his manic periods:

**Q.** Now the Judge also asked you about episodes where instead of being depressed you get very high. How often does that happen?

**A.** Maybe once or twice a month.

**Q.** And when that happens, how do you feel then?

**A.** Like I'm on top of the world. Like I can do anything. Unfortunately when I come down off of it, it's like crashing. I can go be up, and just like somebody flips a switch, I go back down.

**Q.** And when that happened what do you do then?

**A.** I usually wind up going to my room and going to sleep. It - - I know, I'm not describing this right.

**Q.** Take your time, you're doing okay. How long do you sleep?

**A.** Usually a good eight to ten hours.

(R. at 46.) Finally, Mr. Tidd's counsel asked whether he could attend work:

**Q.** If you had to go to work at the job that the Judge talked about, it's very simple, repetitive type job, would there be days during the week when you could not physically get yourself up and get yourself to that job?

**A.** Yes.

**Q.** And why would that be?

**A.** Because I can't regulate my sleep consistent to maintain a set schedule, because some nights I only sleep two hours. Other nights I sleep 14, 15 hours. And it's very hard to make a time commitment when I don't know if I'm going to sleep, or not sleep, whether or not I'm going to hear the alarm. Because when I do sleep, I sleep very sound. But I don't know if I'm going to sleep good, or sleep bad.

**Q.** So is it fair to say that you never know what your condition is going to be from one day to the next?

**A.** Right.

(R. at 47-48.)

### d. Discussion

Despite Mr. Tidd's testimony, much of it directly elicited by the ALJ, the ALJ failed to explain his credibility finding or point to evidence in the record that contradicts Mr. Tidd's

23

testimony regarding his ability to attend work. Burns, 312 F.3d at 129. The job the ALJ has left
for this Court is to simply assume that any testimony offered by Mr. Tidd that is inconsistent
with the ALJ's findings and conclusions must be because the ALJ found such testimony not
credible. Thus, the only way to support the ALJ's credibility finding is to view his finding that
"the claimant is capable of [maintaining regular attendance at a job] within the scope of the
residual functional capacity adopted here," as implying that the ALJ found the claimant's
testimony regarding his sleep difficulties, his panic attacks that require a full day of sleep
recovery, his reclusiveness, and his leaving the house only once per week as not credible.

        "Social Security Ruling 96-7p provides that ALJs must supply 'specific reasons' for a
credibility finding; the ALJ cannot state simply that 'the individual's allegations have been
considered' or that 'the allegations are (or are not) credible.'" Golembiewski v. Barnhart, 322
F.3d 912, 915 (7th Cir. 2003) (quoting SSR 96-7p). "[N]othing in Social Security Ruling 96-7p
suggests that the reasons for a credibility finding may be implied." Id. at 916. In Golembiewski,
as in the instant case, the ALJ found the claimant's testimony less than credible "'for the reasons
set forth in the body of the decision,'" but "the body of the decision contain[ed] no reasons why
the ALJ found [the claimant's] testimony unbelievable." Id. at 915. The Court in Golembiewski
held that it was error for the ALJ to discredit the claimant's testimony without explaining his
reasons for rejecting the testimony. Id. at 915-916. The Court explained that "the cases make
clear that the ALJ must specify the reasons for his finding so that the applicant and subsequent
reviewers will have a fair sense of the weight given to the applicant's testimony. Id. at 916
(citing Schaudeck v. Commissioner, 181 F.3d 429, 433-34 (3d Cir. 1999); Steele v. Barnhart,
290 F.3d 936, 942 (7th Cir. 2002); Briggs v. Massanari, 248 F.3d 1235, 1239 (10th Cir. 2001)).

        Here, the ALJ is silent as to whether the objective medical evidence and other evidence
in the record supports or contradicts Mr. Tidd's testimony. 20 C.F.R. 404.1529(a); Baerga, 500
F.3d at 312. As discussed below, competent probative evidence exists that supports or is
consistent with Mr. Tidd's testimony, but we cannot tell if the ALJ rejected this evidence or
ignored it since he does not discuss this evidence in relation to his credibility finding. Sykes,

228 F.3d at 266 n.9; Schaudeck, 181 F.3d at 433. Without a discussion from the ALJ showing us which evidence he relied on and which evidence he rejected, we cannot say that the ALJ gave Mr. Tidd's complaints "serious consideration." See Burns, 312 F.3d at 129 (citing Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir.1993). Based on the above discussion, at a minimum a remand is necessary to permit the ALJ to explain his credibility determination by pointing to record evidence that supports his determination, and to provide reasons for rejecting competent evidence that is inconsistent with his determination. However, our review of the evidence as set forth below persuades us that a reversal of the ALJ's decision is appropriate.

### 3. Residual Functional Capacity Determination

Reviewing the medical evidence in support of the ALJ's residual functional capacity determination shows that the ALJ also erred by failing to thoroughly evaluate and weigh the medical evidence. In particular, the ALJ's failure to explain his credibility determination becomes more suspect in light of the fact that the majority of the medical evidence not discussed by the ALJ is not inconsistent with, and often supports, Mr. Tidd's testimony.

The Commissioner begins her argument in support of the ALJ's residual functional capacity determination with the conclusory statement that the

> ALJ properly considered, analyzed, and weighed the medical evidence and other evidence of record in determining Plaintiff's RFC. Substantial evidence, therefore, supports his RFC finding and he did not 'ignore' any limitations that were supported by the record.

(Commissioner's Brief in Support, at 20.) More specifically, the Commissioner argues that "the medical evidence failed to support [Mr. Tidd's] claim" of severe functional limitations as a result of being socially isolated, having manic/depressive episodes, and sleep disruptions. (Id.)

### a. September 2002 Medical Reports

First, the Commissioner argues that even though Mr. Tidd reported to Dr. Su on September 17, 2002, that he had mood instability, paranoia, and social isolation, he also admitted to Dr. Su that he was abusing alcohol, marijuana, and methamphetamine (which he used that morning). (Id. at 20-21.) In a similar manner, the Commissioner notes that in October 2002,

Mr. Tidd complained of being anxious and depressed, "but he admitted using methamphetamine the weekend prior to his checkup." (Id. at 21.)  The Commissioner does not expand on this evidence, and we note that it reveals nothing more than that Mr. Tidd consistently reported his symptoms both before and after these dates and that he was truthfully reporting his substance abuse.  Perhaps the Commissioner is implying that Mr. Tidd's substance abuse mentioned in these two episodes is the real cause of his reported mood instability, paranoia, social isolation, anxiety, and depression.  However, the Commissioner did not explicitly make this argument, the ALJ did not make this argument, and even if it were made it would fail to account for the fact that Mr. Tidd reported the same or similar problems even when he was not abusing substances.

Next, the Commissioner refers to the September 25, 2002 psychological evaluation report in which the psychologist noted that Mr. Tidd had "a mild-moderate decline on basic attentional measures and more complex measures of divided attention." (Id.)  However, the Commissioner adds that the doctor also "noted that [Mr. Tidd] was able to work for sustained periods and did not demonstrate any disorder of impulse control." (Id.)  Read in context, the doctor's statement that Mr. Tidd was able to work for sustained periods clearly refers to his ability to "work" at the tests administered to him on October 11, 2002 (which took three hours, from 1:00 p.m. to 4:00 p.m.) and October 25, 2002 (which took 2 hours, from 1:00 p.m. to 3:00 p.m.).  (See R. at 231 (for dates and hours) & 234.)  Even so, the evidence presented by the Commissioner concerns concentration, persistence, and pace, and does not address the argument raised by Mr. Tidd that the record evidence shows that he would be unable to maintain regular attendance at work.

### b. Community Integration, Inc. Medical Records

Next, the Commissioner argues in support of the ALJ's determination by citing to medical records from Community Integration, Inc.  It is in our review of these records that we find a deficiency in the ALJ's assessment of the evidence that also relates to the inadequate credibility determination.  As we discuss below, the Commissioner's summary of the Community Integration records, while accurate, is incomplete and fails to give a true picture of Mr. Tidd during the time period from September 2002 through February 2004.  The ALJ failed

to address or explain conflicts between the Community Integration records and the state agency records. The ALJ also failed to address these records insofar as this evidence does not support the ALJ's credibility finding, but rather it is consistent with Mr. Tidd's testimony.

The ALJ only discussed selected Community Integration records in his decision. The ALJ refers to Mr. Tidd's initial evaluation at Community Integration by Dr. Su on September 17, 2002, and he refers to the Community Integration psychological evaluation report based on testing performed in October 2002. (R. at 19, 20.) The ALJ only directly refers to the September 2003 and February 2004 Progress Notes. (R. at 20.) The ALJ generally refers to Progress Notes dated October and December 2003 and February 2004 in stating that the "most recent notes from Community Integration (Exhibit 9F) show improvement." (R. at 20.) Finally, in giving little weight to the opinion of the Action Review Group, Inc., the ALJ stated that he found the "views of Dr. Hillin and the state agency consistent with the medical record, *most particularly the treatment records of Community Integration*." (R. at 20 (emphasis added).)

Below we set forth the date of each Community Integration report followed by the Commissioner's summary, and then a more complete summary of the same record, including three not mentioned by the Commissioner.

### October 7, 2002

The Commissioner states that Mr. Tidd reported that Zyprexa was helping his mood swings but not his depression, thus Dr. Taylor prescribed Effexor for his depression (Commissioner's Brief in Support, at 21, citing R. at 175).

• Mr. Tidd also reported that he was not sleeping and Temazepam was prescribed to address this. Dr. Taylor reported that his response to treatment was "inadequate," and gave him a GAF of 50.

### November 8, 2002

(*Not noted by the Commissioner.*)

• Mr. Tidd complained of an inability to concentrate, and that he was avoiding interactions with others because of his low tolerance for stress. Dr. Su reported that he was still having mood instability and psychosis and increased his Zyprexa to treat psychosis and instability. Response to treatment was seen as "fair," and his GAF remained at 50. (R. at 173.)

27

**January 17, 2003**

(*Not noted by the Commissioner.*)

• Mr. Tidd reported that he had increased depression, with improvement. His Effexor was increased, and Dr. Taylor reported that his response to treatment was "partially effective," but kept his GAF at 50.

**February 6, 2003**

(*Not noted by the Commissioner.*)

• Mr. Tidd appeared on an emergency basis having flushed all his medications down the toilet out of fear he would take them all at once. Dr. Taylor gave him a two-week supply of medications, reported that his response to treatment was "fair/poor," and kept his GAF at 50.

**April 28, 2003**

The Commissioner states that Mr. Tidd complained of erratic sleep and deep bouts of depression, and thus his Effexor was increased (Commissioner's Brief in Support, at 22, citing R. at 225).

• Mr. Tidd reported that his "depression was kicking my ass - not going away," and he reported uncontrollable crying, decreased motivation, obsessive thinking, erratic sleep and early waking. Dr. Taylor reported that his response to treatment was "partially adequate," and reduced his GAF to 45.

**June 19, 2003**

The Commissioner states that Mr. Tidd had no sleep complaints and was doing moderately better (Commissioner's Brief in Support, at 22, citing R. at 224).

• Mr. Tidd also reported that he had a rough month. Dr. Taylor noted that he was "doing better 'moderately better'", but that he had some days of dysphoria. Dr. Taylor referred him to a stress anxiety group, reported that his response to treatment was seen as "adequate," and put his GAF back at 50. (R. at 224.)

**August 7, 2003**

The Commissioner states that Mr. Tidd complained of excessive sleep, so his medications were changed, and Dr. Su's opinion was that Mr. Tidd was doing "generally well." (Commissioner's Brief in Support, at 22, citing R. at 223).

• Mr. Tidd also reported to the intake nurse that the "meds helped some - but it's not doing a lot for my depression," he rated his depression a 3-4 on a scale of 1 to 5; he reported sleeping 12 hours at night with a 3 to 4 hour nap during the day; and he reported decreased motivation. Mr. Tidd reported to Dr. Su that he was doing generally well, and complaining of anxiety and excessive sedation due to

medications. Dr. Su stopped the Temazepam to address the excessive sleep and added Buspar for anxiety. Dr. Su reported that his response to treatment was seen as "fair," and assessed his GAF at 50. (R. at 223.)

### September 30, 2003

The Commissioner states that Dr. Taylor noted that Mr. Tidd's presentation was "isolating schizoid like" and that he smelled strongly of stale alcohol, although he denied use. The Commissioner also notes that Mr. Tidd denied having acute depression and did not complain of any sleep problems, and Dr. Taylor increased his Zyprexa (Commissioner's Brief in Support, at 22, citing R. at 222).

• Mr. Tidd presented with an unkempt appearance and bad hygiene. He complained of having blackouts and rated his depression as a 3 on a 1 to 5 scale. Dr. Taylor described him as having an "isolating schizoid like presentation / [and] internally preoccupied." He complained of increased anxiety, but denied acute depression. Dr. Taylor noted that he smelled of "stale alcohol strongly[,] but denies use." Dr. Taylor increased his Zyprexa "for probable psychosis," and again reduced his GAF to 45.

### October 28, 2003

The Commissioner states that Mr. Tidd reported that he was "sleeping well" and Dr. Taylor noted that he was less internally preoccupied than the September visit. His response to medications was adequate and were not changed (Commissioner's Brief in Support, at 22, citing R. at 239).

• Mr. Tidd again presented with an unkempt appearance, and reported to the intake nurse that the increase in Zyprexa was not doing a whole lot either way. He also reported that he either slept 12 hours a night, or he slept 3 to 4 hours a night. Mr. Tidd reported to Dr. Taylor that he had lingering anxiety when he was stressed, and he was sleeping well. Dr. Taylor noted that he was "less internally preoccupied than last visit" with a "blunt affect." Response to treatment was seen as adequate, and his GAF was again placed at 50. (R. at 239.)

### December 11, 2003

The Commissioner states that Mr. Tidd was doing well on his medications and reported that he "maybe" had increased sleep (Commissioner's Brief in Support, at 22, citing R. at 238, 244).

• Mr. Tidd again presented with an unkempt appearance. He reported that he likes to read, hunt and fish, that he "maybe" has increased sleep, and that he was stable. He told Dr. Su that he was doing relatively better but still had good days and bad days. Dr. Su reported that his response to treatment was "fair," medication was "effective," and his GAF remained at 50. (R. at 238.)

**February 10, 2004**

The Commissioner states that Mr. Tidd reported increased sleep and of having good days and bad days, but he reported no acute psychotic episodes, his response to treatment was stable, and his medications were not changed (Commissioner's Brief in Support, at 22-23, citing R. at 237).

• Mr. Tidd reported that he had good days and bad days, complained of increased sleep, and that overall he was stable. Dr. Taylor reported that no acute psychotic state was observed or reported, his response to treatment was "stable," his medications were not changed, and his GAF remained at 50.   (R. at 237.)

Our review of the full Progress Notes from Community Integration shows that rather than supporting the ALJ's residual functional capacity determination, Mr. Tidd's medical evidence supports his testimony regarding his sleep difficulties.  Throughout the time period covered by these records Mr. Tidd consistently complained of having sleep problems.  In August 2003, he reported to the intake nurse that he was sleeping 12 hours during the night with a 3 to 4 hour nap during the day.  Dr. Su attempted to address his "excessive sedation" by eliminating a medication.  However, in October 2003, after being off the medication for two months he again reported to the intake nurse that he either slept 12 hours a night, or he slept 3 to 4 hours a night. In December, Mr. Tidd reported that he "maybe" has increased sleep, which can only mean that he was "maybe" sleeping more than the 12 hours a night and/or more than a 3 to 4 hour nap during the day.  Finally, in February 2004, Mr. Tidd again reported that his sleep was increased. This medical evidence is consistent with Mr. Tidd's testimony.

Curiously, in October 2003, Mr. Tidd reported to Dr. Taylor that he was "sleeping well," after he had already reported to the intake nurse that he was sleeping at night either 12 hours or 3-4 hours.   Neither the ALJ nor the Commissioner mention this anomaly.  The Commissioner only mentions that Mr. Tidd reported "sleeping well," but does not mention that he also reported his continuing sleep difficulties to the intake nurse.

The Community Integration records also show that for over one year neither Dr. Su nor Dr. Taylor rated Mr. Tidd's global functioning assessment as higher than 50.  In addition, neither doctor rated Mr. Tidd's response to treatment as ever being better than "adequate."  In February 2004, Dr. Su  reported that Mr. Tidd's response to treatment was "stable," however, when

30

examined in the context of the medical records it is clear that Dr. Su was assessing Mr. Tidd's condition as remaining the same; *i.e.*, no better and no worse.

### c. State Agency Psychologist Byron Hillin's Report

The Commissioner also relies on the February 2003 evaluation by the State Agency Psychologist Byron E. Hillin, Ph.D. (Commissioner's Brief in Support, at 21-22.)  Here, the Commissioner juxtaposes apparently contradictory items but fails to expand on why these are significant.  The Commissioner notes that Mr. Tidd reported to Dr. Hillin that he was a loner, but he also "admitted" that he saw his fiancee once a week and a friend drove him to the evaluation. (Id. at 21.)  Apparently this is meant to show that perhaps Mr. Tidd is not reclusive; however, the fact that he sees his fiancee, or that someone who he describes as a friend drove him to an interview, is hardly substantial evidence that he is not reclusive.  The Commissioner also finds it striking, and we do not, that Mr. Tidd could report difficulty sleeping but also be "alert and oriented during the interview."  (Id.)

Next, the Commissioner notes that Dr. Hillin reported that Mr. Tidd's "current complaints of mood instability and cognitive problems are felt to be substantially influenced by his drug and alcohol addiction problems."  (R. at 202, Commissioner's Brief in Support, at 21.) We agree that Dr. Hillin does emphasize Mr. Tidd's substance abuse issues.  In giving his diagnoses, Dr. Hillin named as his first and second diagnoses, Alcohol Dependence and Amphetamine Dependence.  However, the ALJ found that Mr. Tidd's substance abuse no longer met a disability listing after he "began treatment in September [2002] at Community Integration," and that "the evidence does not contradict the claimant's testimony that he has been free of substance abuse."  (R. at 19.)  Moreover, there is no reference of substance abuse by either of his treating doctors after October 2002.  The record evidence supports that Mr. Tidd was free of substance abuse for an entire year after Dr. Hillin's February 2003 evaluation and his complaints of mood instability and cognitive problems continued.  Not only does this negate the argument that Mr. Tidd's mood instability and cognitive problems are the result of substance abuse, but also it undermines the weight of Dr. Hillin's report.  He emphasized substance abuse

31

as a contributing factor, but the medical evidence does not support that Mr. Tidd's continuing problems through February 2004 were substantially influenced by his drug and alcohol addiction problems.  To the contrary, drugs and alcohol were removed and his problems continued.

We also note that Mr. Tidd reported to Dr. Hillin that he was having sleep difficulty, ranging from only getting two hours of sleep per night, to sleeping up to 12 hours per night.  Again, this is consistent with Mr. Tidd's testimony and with the medical evidence from Community Integration.  However, while emphasizing Mr. Tidd's substance abuse problems, Dr. Hillin had no comment as to how Mr. Tidd's sleep difficulties affected him.  Finally, we note that Dr. Hillin assessed Mr. Tidd's GAF at 60-75, a full ten to twenty-five points higher than the highest assessment either of the two treating doctors would give Mr. Tidd during the time period they treated him from September 2002 through February 2004.

### d. State Agency Psychologist Sanford Golin's Report

We need not say much about the non-examining state agency evaluator Dr. Golin's report.  We note that neither the Commissioner nor the ALJ mentioned his report other than to generally state that it was consistent with Dr. Hillin's opinion.  (Commissioner's Brief in Support, at 23; R. at 20.)  Dr. Golin had the advantage of reviewing the entire medical record in the year that had passed since Dr. Hillin conducted his evaluation.  He ended up giving "great weight" to Dr. Hillin's opinion. (R. at 207.)  However, it is clear that Dr. Golin's assessment was based primarily, if not solely, on Dr. Hillin's report.  Dr. Golin did cite other medical evidence he reviewed in conducting his evaluation, but even that evidence is woefully incomplete.  Dr. Golin cited the March 1991 St. Vincent records; Dr. Besner's February 3, 2000 report; Dr. Su's September 17, 2002 report; an October 7, 2002 cognition report (apparently a Progress Note from Community Integration); and a July 14, 2000 report regarding the St. Vincent hospitalization.  Despite conducting his evaluation in March 2004, Dr. Golin apparently neglected to review any of the Community Integration progress notes dating from November 2002 to February 2004.

32

### e. Other Record Evidence

The Commissioner also argues that other evidence in the record does not support Mr.

Tidd's claimed limitations. (Commissioner's Brief in Support, at 24.) In support of this argument

the Commissioner states:

> In January 2003, when Plaintiff filed for benefits, he reported that he had not
> spoken to his family in more than one year and was nervous around people, but he
> then stated that he played cards, watched television, and hunted with friends
> and/or family once a month (Tr. 110). In March 2004, Plaintiff claimed that he
> slept all of the time and did not visit his family and friends (Tr. 129.) He also
> stated, however, that he lived too far away from his family and friends, needed no
> assistance with his personal needs, and went to the movies. (Tr. 127-28.)

(Id.) The Commissioner makes no attempt, nor does the ALJ, to reconcile the implicit

conclusion in this argument that Mr. Tidd is not credible with regard to his reclusiveness, with

the record evidence showing that he consistently reported his reclusive nature. For example, the

record evidence shows that he reported the following:

- In February 2000, no contact with his mother for the last two years, no contact
  with his daughter and only speaks to his son two to three times per year;

- On September 10, 2002, no contact with his mother for the past 10 years, no
  contact with his father for the past one and one-half years, and no contact with his
  siblings except for his 3 full sisters;

- On September 17, 2002, he is estranged from his family and that he has not had
  recent contact with any family members;

- In November 2002, avoiding interactions with others;

- In February 2004, no contact with his ex-wife or his son or daughter, estranged
  from his family, and contact with only one sister; and

- In March 2004, he was not a social person.

The Commissioner also offers no argument to explain why the examples cited from the record

mean that Mr. Tidd is either not reclusive, or is not credible about his reclusiveness. Being

reclusive does not mean having no contact with anyone. Thus, it is not so shocking that

Mr. Tidd reported that in January 2003 that he tries to play cards, watch television, and hunt with

friends and/or family once a month. (R. at 110). We also fail to see the significance of

Mr. Tidd's one-time statement that he does not visit family and friends because they live too far

33

away in light of the numerous other occasions on which he reported an estrangement from his family. (R. at129.) Finally, the Commissioner's decision not to explain the significance of this evidence or relate it to the question of the ALJ's credibility determination indicates that there really is not much of an argument to make.

### f. Discussion

In light of our review of the medical evidence we conclude that the ALJ did not thoroughly evaluate and weigh the medical evidence. The ALJ's residual functional capacity determination is narrowly based on crediting medical records from Dr. Hillin, Dr. Golin, and limited treatment records from Community Integration. However, as our review of the record evidence shows, the ALJ did not fully consider all of the medical evidence from Community Integration. As a result, the ALJ did not attempt to reconcile basic conflicts in the medical evidence between Community Integration records on one hand and the state agency doctors on the other hand. In addition, the ALJ failed to explain why, if true, he rejected competent evidence that is consistent with Mr. Tidd's testimony. Thus, we conclude that the ALJ's residual functional capacity determination is in error as it is not supported by substantial evidence.

Significantly, the medical evidence not addressed by the ALJ does not support the ALJ's credibility determination insofar as the ALJ discounted Mr. Tidd's testimony that he would be unable to maintain the required attendance at work. As set forth above, Mr. Tidd consistently reported his sleep difficulties to his treating doctors, and nothing in the record evidence contradicts his testimony. The ALJ did not make a specific credibility finding and did not explain or support his general credibility determination. Given that the ALJ credits the Community Integration medical records and nowhere discredits the treating doctors Dr. Su and Dr. Taylor, we fail to see how the ALJ would, on a remand, be able to credit Dr. Hillin's assessment. To do so would necessarily mean that the ALJ must reverse course and discredit a great portion of the medical records from Community Integration that he has already credited. Based on our review of the record evidence, we find that the ALJ's credibility finding is in error in that the ALJ cannot uphold his credibility determination without discrediting medical records

34

he relied on when determining Mr. Tidd's residual functional capacity. Based on the medical

records, especially from Community Integration, we find that the objective medical evidence is

consistent with Mr. Tidd's testimony. We therefore conclude that the vocational expert's

assessment of Mr. Tidd's ability to perform work was based on a flawed hypothetical because it

failed to account for his limitations that he does not leave his house more than one day a week,

and one day per week he does not leave his room.

> The United States Court of Appeals for the Third Circuit instructs that a
>
> vocational expert's testimony concerning a claimant's ability to perform
> alternative employment may only be considered for purposes of determining
> disability if the question accurately portrays the claimant's individual physical and
> mental impairments. A hypothetical question posed to a vocational expert must
> reflect all of a claimant's impairments.

Burns, 312 F.3d at 123 (citations omitted); see also Chrupcala v. Heckler, 829 F.2d 1269, 1276

(3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). Counsel for Mr. Tidd

posed a hypothetical to the vocational expert that did include the above limitations. In response,

the vocational expert testified that Mr. Tidd would be unable to work. (R. at 53.) Accordingly,

we will find that Mr. Tidd is disabled.

## B. Substantial Evidence

"Despite the deference due to administrative decisions in disability benefit cases,

'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if

the [Commissioner]'s decision is not supported by substantial evidence.' " Morales v. Apfel, 225

F.3d 310, 317 (3d Cir.2000) (quoting Smith, 637 F.2d at 970).

Reviewing the supporting evidence and the ALJ's reasoning and review of the evidence

as it underlies the ALJ's credibility finding, we find that the ALJ's conclusion that Mr. Tidd was

not fully credible is not supported by substantial evidence. The body of the ALJ's opinion

contains no reasons why he found Mr. Tidd's testimony incredible. In contrast, there was

objective medical evidence that does not contradict, and even supports, Mr. Tidd's testimony

regarding his limitations. In addition, while the ALJ also found that Mr. Tidd was able to

35

maintain regular attendance at work, he offered no explanation for this finding and cited no record evidence in support of it.

With regard to determining Mr. Tidd's residual functional capacity the ALJ did not consider "all relevant evidence." Fargnoli, 247 F.3d at 40 (citing 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546); Burnett, 220 F.3d at 121). The ALJ failed to account for all of the medical evidence from Community Integration, which alone would warrant the conclusion that the ALJ's residual functional capacity determination is not supported by substantial evidence. In addition, the ALJ's conclusion that Mr. Tidd was capable of doing simple, routine, repetitious tasks, with specified limitations necessarily depends on his finding that Mr. Tidd was not fully credible regarding his ability to maintain regular attendance at work. We have concluded that this credibility finding is in error as the ALJ failed to provide any basis for the finding, there is record evidence that is consistent over time that supports Mr. Tidd's testimony, and the ALJ did not address this evidence. Thus, we conclude that the ALJ's residual functional capacity determination is in error as it is not supported by substantial evidence.

For similar reasons, and for the reasons set forth in our analysis, we also conclude that the ALJ erred in disregarding Mr. Tidd's counsel's hypothetical question with the limitation that Mr. Tidd does not leave his house more than one day a week, and he has one day per week where he does not come out of his room. (R. at 53.) In response to this hypothetical, the vocational expert responded that Mr. Tidd would not be able to be employed. Given our evaluation of the evidence, our findings and conclusions, we therefore adopt the vocational expert's response that Mr. Tidd is not able to be employed and thus not able to perform substantial gainful activity. Therefore, we find that he is disabled. Accordingly, we will reverse the decision of the Commissioner and remand for an award of benefits.

## VI. Conclusion

For the foregoing reasons, we conclude that there is not substantial evidence existing in the record to support the Commissioner's decision that Plaintiff is not disabled, and therefore, the Defendant's motion for summary judgment is denied. In addition, for the above stated

36

reasons, the decision of the Commissioner denying Plaintiff's claim for disability insurance benefits and supplemental security income must be reversed. This matter is remanded to the Commissioner for insurance benefits to be calculated and awarded to Plaintiff.

An appropriate order will be entered.

June 28, 2006
Date

Maurice B. Cohill, Jr.

Hon. Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc:    counsel of record

37